CV 12 - 2909

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

2012 JUN 11  AM 9: 45
U.S. DISTRICT COURT
EASTERN DISTRICT
OF NEW YORK
FILED
CLERK

JACOB STEVENS, as Administrator of the
ESTATE OF CLARA HEYWORTH, deceased,

12 Civ. _____

                   Plaintiff,

**ECF Case**

-v-

ANTHONY WEBB, AYESHA P. CUBIA-
WEBB, the CITY OF NEW YORK, NYPD
Chief JAMES ROE, NYPD Sergeant
ALESSIO BONO, NYPD Detective JOHN
DOE,

**Jury Trial Demanded
On All Counts**

MATSUMOTO, J.

SUMMONS ISSUED

               Defendants.

MATSUMOTO, J.

GOLD, M.J.

1.      This case concerns the death of 28 year-old Clara Heyworth, who was killed by an intoxicated, unlicensed and speeding motorist, Anthony Webb.  Webb's outrageous conduct will go unpunished, because the New York City Police Department failed to investigate Webb, and caused evidence of his crime to be destroyed.  NYPD did so in violation of its express duty under the New York Vehicle and Traffic Law, and in violation of the state and federal rights of Heyworth's husband, Jacob Stevens.

2.      This was no random lapse.  NYPD has an official policy of failing to meaningfully investigate crashes, except when fatality is immediate or near-certain. NYPD systematically misclassifies vehicular crimes as "accidents," creating a false appearance of declining crime rates while motorists like Webb escape consequences.

3.      Stevens brings this suit to hold Webb accountable for the death of his wife, and to hold the City of New York, NYPD and several of its officers accountable for obstructing civil and criminal justice.

## PARTIES

4.      Plaintiff Jacob Stevens ("Stevens") was married to the late Clara Heyworth ("Heyworth").  On December 7, 2011, Stevens was appointed the Administrator of the Estate of Clara Heyworth by the Honorable Margarita Lopez Torres, Surrogate of the County of Kings, City and State of New York.  Because Heyworth was a citizen only of the foreign states of the United Kingdom and Australia at the time of her death, pursuant to 28 USC Section 1332(c)(2), Stevens in his capacity as Administrator of her estate is a citizen only of those foreign states.

5.      Defendant Anthony Webb ("Webb") is, and all times relevant was, a resident of the State of New York.

6.      Defendant Ayesha P. Cubia-Webb ("Cubia-Webb") is, and all times relevant was, a resident of the State of New York.

7.      Defendant The City of New York (the "City") is a municipal entity created and authorized under the laws of the State of New York.  It is authorized by law to maintain the New York City Police Department ("NYPD"), which acts as its agent in the area of law enforcement and for which it is ultimately responsible.  The City assumes the risks incidental to the maintenance of a police force and the employment of police officers as those risks attach to the public consumers of the services provided by the NYPD.

8.      Defendant James Roe ("Roe") is pseudonymous NYPD supervisory officer with oversight responsibility of the NYPD Highway Division and its constituent

2

forces, including the Accident Investigation Squad ("AIS"). Roe is sued in his individual and official capacity.

9.    Defendant Alessio Bono ("Bono") is an NYPD sergeant who at all times relevant was and is a supervisor in the Highway Division Accident Investigation Squad, District 2. Bono is sued in his individual and official capacity.

10.    Defendant John Doe is a pseudonymous NYPD detective assigned to the Highway Division Accident Investigation Squad, District 2. Doe is sued in his individual and official capacity.

## JURISDICTION AND VENUE

11.    This Court has subject matter jurisdiction over the entire controversy pursuant to 28 U.S.C. Section 1332(a)(2), because the amount in controversy exceeds $75,000, and the Plaintiff Stevens is a citizen of the United Kingdom and Australia, while all of the defendants are citizens of the State of New York.

12.    This Court also has subject matter over the federal claims presented pursuant to 28 U.S.C. Sections 1331, 1343 (3-4) and 1367(a). This action is brought, in part, pursuant to 42 U.S.C. Sections 1983 and 1988 for violations of Article IV of, and of Fifth and Fourteenth Amendments to, the Constitution of the United States.

13.    This Court also has supplemental jurisdiction over plaintiff's state-law claims because those claims are so related to the federal claims asserted that they form part of the same case or controversy pursuant to 28 U.S.C. § 1367(a).

14.    Venue is proper pursuant to 28 U.S.C. § 1391(a)(2), in that Stevens' claims arose in the Eastern District of New York.

15.     Pursuant to New York General Municipal Law Section 50-e, Stevens filed a timely Notice of Claim with the New York City Comptroller on May 10, 2012. Plaintiff's claim was not adjusted by the New York City Comptroller's Office within the period of time provided by statute.

## BACKGROUND

### A.     The Crash.

16.     At 1:50 a.m. on Sunday morning, July 10, 2011, Webb was driving a 2008 Honda sedan, New York license number EGD3307 (the "Automobile"), the owner of which, Cubia-Webb, had permitted him to use.

17.     As Webb drove the Automobile southbound on Vanderbilt Avenue in Brooklyn, he struck Heyworth as she was crossing the street to join her husband Stevens. Heyworth sustained grievous injuries in the crash (the "Crash"), including multiple blunt impact injuries to the head, the right lower extremity, and the thorax, as well as extensive hemorrhages and shattered bones.

18.     Although Stevens witnessed the Crash, he can recall no visual memory of it due to psychological trauma.

19.     On information and belief, at the time of Crash, Webb was impaired by the use of alcohol, driving at excessive speed, and violating other traffic laws. In addition, Webb was driving alone — in violation of a restriction on his license.

### B.     NYPD's Response.

20.     NYPD officers assigned to the 88th Precinct arrived approximately 15 minutes after the Crash, at 2:05. It was immediately apparent to them that Heyworth had

4

sustained serious injuries and likely would die. At 2:06 a.m. — within a *minute* of arriving at the crash scene — an 88th Precinct officer radioed to a 911 dispatcher that Heyworth "may be likely" to die. Two minutes later, the officer stated: "need[] AIS to respond to loc[ation]."

21. "AIS" is the NYPD Accident Investigation Squad, comprised of officers assigned to the NYPD Highway District in each borough who are responsible for the investigation of fatal and other serious crashes.

22. Thereafter the officers at the Crash scene made repeated attempts to summon the AIS. At 2:10 a.m., the officers stated that "Hwy Dist Rivera [notified]." At 2:34 a.m., the NYPD dispatcher stated that "HWY Units advised" of the need for AIS to respond to the scene of the Crash.

23. While the officers at the scene called for AIS to respond, Heyworth was rushed by ambulance to Bellevue Hospital.

24. Moments after her arrival at Bellevue, at 2:59 a.m., the NYPD dispatcher announced that on the "Auth[ority] of HWY 2 Sgt — Cxl [cancel] AIS job".

25. On information and belief, the Highway Division District 2 sergeant who authorized the cancellation of AIS's investigation of the Crash was Bono. In the alternative, Detective John Doe made the decision to cancel the AIS investigation.

26. The apparent reason for the cancellation given was "No DOA at loc[ation]," *i.e.*, Heyworth was not yet dead when she arrived at Bellevue.

5

**C.    The Loss and Destruction of Critical Evidence.**

27.    Back at the Crash scene, one of the officers from the 88th Precinct suspected that Webb was intoxicated. Equipment needed to measure his blood alcohol was not available on the scene.

28.    Pursuant to the NYPD Patrol Guide, AIS is responsible for conducting blood alcohol tests at the scene of serious crashes, but AIS's involvement in the Crash had been cancelled, so the requisite equipment was not available.

29.    In the absence of an AIS officer, testing equipment was brought from the 88th Precinct. After a one hour delay due to the unavailability of the equipment, Webb was tested and found to have a blood alcohol content of 0.07%. Webb was arrested for driving while intoxicated, among other charges.

30.    The officers from the 88th Precinct left the Crash scene without gathering or recording any evidence of the Crash and how it occurred, such as by taking measurements of Heyworth's body in relation to Webb's vehicle, measuring skid marks, taking photographs, identifying witnesses, or gathering videotape from local surveillance cameras.

31.    Pursuant to the NYPD Patrol Guide, AIS is responsible for gathering and recording such evidence at the scenes of serious crashes, but AIS's involvement in the Crash had been cancelled, so these critical steps were not taken.

32.    It was later discovered that the equipment from the 88th Precinct used to measure Webb's blood alcohol content, although capable of taking accurate

6

measurements, had not been calibrated according the schedule recommended by the manufacturer.

33.    Due to this technical deficiency, no evidence admissible in criminal court of Webb's impairment was preserved.

34.    On July 11, 2012, the day after the Crash, Clara Heyworth died of her injuries.

35.    On July 14, 2011, NYPD was advised of Heyworth's death, and resumed the investigation of the Crash. But by that time, on information and belief, virtually all of the critical evidence of Webb's culpability had already been lost or destroyed:

> a.  all witnesses to the Crash save Stevens himself had dispersed, and none could be found;
>
> b.  no pictures were taken of the Crash scene;
>
> c.  video recordings of the Crash captured by surveillance cameras at nearby establishments had been erased, because the owners were not alerted to the need for preservation;
>
> d.  information from the Automobile's Event Data Recorder, which would have shown the Automobile's speed when it first braked after the impact with Heyworth, was overwritten;
>
> e.  Any alcohol in Webb's bloodstream at the time of the Crash had long since been metabolized and lost;
>
> f.  skid marks left by the Automobile when it braked following the Crash, from which vehicle speed estimates could have been determined, were destroyed before they could be measured;
>
> g.  the positions in the roadway of Heyworth and of clothing knocked from her by the impact were not recorded, so that information is not available for use in reconstructing the Crash; and
>
> h.  the damage to the Automobile caused by the Crash was not recorded by police until weeks later, after it had been in the repair shop.

7

### D.    The District Attorney's Decision to Drop Charges.

36.    Stevens cooperated with representatives of the Kings County District Attorney's Office, including Tom Kessler and Taylor Koss, who were assigned to determine whether Webb would be prosecuted for his role in the Crash.

37.    At a meeting held October 15, 2011, Stevens was advised that the District Attorney's Office would seek to obtain a grand jury indictment of Webb on various charges, including vehicular manslaughter, a felony.

38.    On October 21, Stevens met with Taylor Koss, who advised him that the breath testing equipment used to test Webb after the Crash had not been calibrated since 2007, and would not be admissible in a prosecution of Webb.  For this reason, Stevens was told, the decision to pursue felony charges against Webb would be reconsidered.

39.    On or about February 16, 2012, the District Attorney's office notified Stevens that all criminal charges against Webb would be dropped, due to the lack of admissible evidence.

### E.    NYPD's Duty to Investigate Serious Crashes.

40.    NYPD failed to investigate the Heyworth Crash, and allowed the destruction of critical evidence, despite its duty under the New York Vehicle and Traffic Law to investigate all crashes resulting in personal injury.

41.    Vehicle and Traffic Law Section 603(1) provides: "Every police or judicial officer to whom an accident resulting in injury to a person shall have been reported . . . ***shall immediately investigate the facts, or cause the same to be investigated*** . . . ." (emphasis added).

42.    The adjacent Section 603-a functions in tandem with Section 603 in cases involving serious physical injury or death.  Under Section 603-a, the investigation of these more serious crashes must address certain issues, including the issue of whether the crash was caused by the violation of traffic laws:

> ***In addition to the requirements of section six hundred three of this article***, whenever a motor vehicle accident results in serious physical injury or death to a person . . . [s]uch investigation shall be conducted for the purposes of making a determination of . . . . ***whether it can be determined if a violation or violations of this chapter occurred, and if so, the specific provisions of this chapter which were violated and by whom* . . . .**

New York Vehicle and Traffic Law § 603-a(1) (emphasis added).

43.    As in the Heyworth case, most evidence of culpability for a crash is ephemeral, and is lost or destroyed within hours or at most days.

44.    Stevens, like any person whose spouse sustained grave injuries in a crash, was too distraught and preoccupied to launch his own investigation in their wake of the Crash. He relied upon NYPD to fulfill its statutory duty to "***immediately*** investigate the facts," and preserve evidence.  Section 603(1) (emphasis added).  NYPD failed to do so.

45.    Recognizing that persons injured in crashes and their family members necessarily rely upon NYPD in such circumstances, courts have deemed NYPD's statutory duties to investigate crashes "nondiscretionary," and enforceable through a private right of action. E.g., Cunningham v. City of New York, 907 N.Y.S.2d 529, 530 (Sup. Ct. App. Term 1st Dep't 2010).

**E.    NYPD's Systematic Failure to Investigate Serious Crashes.**

9

46. NYPD's failure to investigate the death of Clara Heyworth, and the consequent destruction of evidence of Webb's culpability, is not an isolated lapse.

47. Rather, as a matter of policy, NYPD fails to investigate, and causes the destruction of evidence in, thousands of serious crashes each year.

48. As NYPD Deputy Chief Cassidy of the NYPD Transportation Bureau stated at City Council oversight hearings earlier this year, NYPD has a "general rule" of prohibiting officers from issuing summonses for traffic violations not personally observed by the officer; only AIS officers are excepted from this "general rule":

> the AIS . . . is empowered to issue summonses for the traffic infractions its investigation reveals, including speeding, failure to exercise due care, failure to stop at a red light, et cetera, even though ***under normal circumstances a traffic violation would have had to be personally observed by the issuing officer***. This exception to the general rule is made based on the experience and expertise of the AIS.[1]

49. Chief Cassidy explained that even if eyewitnesses accounts establishing a motorist's recklessness are provided to officers responding to a crash, ordinarily "there is no follow up" in the form of an investigation, arrest or prosecution of the motorist unless the AIS is assigned to the case. NYPD Oversight Hearing Transcript, 55:17-56:7.

50. Pursuant to this policy, the NYPD officers assigned to the 88th Precinct that responded to the Crash were not authorized to take steps to determine whether Webb was traveling at an excessive speed or violated other traffic laws in striking Heyworth.

---

[1]    Transcript of Joint Hearing of New York City Council Committees on Public Safety and Transportation, No. T2012-4275, "Oversight: Proceeding with Caution – an Examination of NYPD's Accident Response and Enforcement of Traffic Rules Relating to Cars, Bikes and Trucks" (Feb. 15, 2012), at 24:3-12 (hereafter "NYPD Oversight Hearing Transcript") (emphasis added), *available at* http://legistar.council.nyc.gov/View.ashx?M=F&ID=1786187&GUID=FC3D57D5-BC6A-4044-81BF-8FB43E7F2078 (accessed June 28, 2012).

The scope of those officers' investigation was limited to violations they could witness: whether Webb was properly licensed, insured, and/or impaired.

51. NYPD also has an express policy of assigning AIS officers to investigate only those crashes which result in death or in which a victim is deemed "likely to die." See Patrol Guide, Section 217-02 (providing that AIS will be notified only of "Vehicle Accidents Which Result In Death Or Serious Injury And Likely To Die").

52. As a result, in thousands of crashes each year in which non-fatal serious physical injury occurs, no AIS investigation is conducted and little or no evidence is preserved.

53. The non-AIS officers responding to those crashes may make arrests based on conduct they observe — such as a driver's impairment — but they are not responsible for recording skid marks, measuring the positions of crash victims in the road, taking photographs, identifying videotape capturing the moment of the crash, or otherwise gathering evidence or determining whether the violation of traffic laws contributed to the crash.

54. In 2011 AIS conducted crash investigations in only 304 cases, 241 of which involved fatalities — meaning that only 63 cases involving non-fatal serious injuries were investigated by AIS. See NYPD Oversight Hearing Transcript, 52:5-23 (Statement of NYPD Lt. Michael Kelly).

11

55.     Approximately 3,000 persons per year sustain serious non-fatal injuries in crashes involving motor vehicle crashes occurring in New York City.[2] AIS's investigation of 63 such cases in 2011 indicates that the requisite investigation is being conducted in approximately 2% of the crashes involving serious non-fatal injury.

56.     Section 603-a requires that the potential contributing role of traffic violations must be investigated in *every* crash involving serious physical injury, regardless of whether victims are deemed likely to die.

57.     NYPD's unsanctioned policy of applying a "fatal or likely to be fatal" threshold for AIS involvement, coupled with the prohibition on non-AIS officers conducting a Section 603-a-type investigation in which liability for non-observed traffic violations may be determined, constitutes a patent violation of Section 603-a.

**F.      NYPD's Failure to Supervise and Train AIS Officers.**

58.     NYPD aggravates its facial violation of 603-a by leaving to the untrained and unsupervised discretion of AIS officers the determination of whether the injuries caused in particular crashes are "likely to be fatal."

59.     As Deputy Chief Cassidy explained, this determination is often made based on informal discussion between officers and hospital personnel caring for the injured crash victim.  NYPD Oversight Hearing Transcript, 50:5-19 (Statement of Deputy Chief Cassidy).

---

[2] New York State Department of Motor Vehicles, "Summary of New York City Motor Vehicle Accidents — 2010," available at http://www.dmv.ny.gov/Statistics/2010NYCAccSummary.pdf (accessed June 8, 2012).

12

60. On information and belief, the officers engaging in these discussions are not instructed as to the precise meaning of "likely to die": whether this phrase is meant to describe a person 90% likely to die, 51% likely to die, or something else.

61. On information and belief, the officers engaging in these discussions do not and cannot explain to hospital personnel whether the phrase "likely to die" is meant to describe a person 90% likely to die, 51% likely to die, or something else.

62. On information and belief, the officers engaging in these discussions are not instructed to seek out a physician with direct responsibility for the crash victim, and in many cases receive opinions regarding the likelihood of death from other physicians or non-physicians who do not have reliable information.

63. There is apparently no requirement that the identity of the hospital personnel providing information on the victim's prognosis, or any other details of the consultation, be recorded by the NYPD making inquiries regarding the likelihood that a crash victim will die.

64. Nonetheless, AIS will not investigate a crash unless hospital personnel "verify" that the crash victim is in fact "likely to die." NYPD Oversight Hearing Transcript, 31:6-17 (Statement of Deputy Chief Cassidy).

65. Often, as in the case of the Heyworth Crash, the consultation occurs within minutes after the victim arrives at a hospital — *before* physicians have had a meaningful opportunity to examine the patient.

13

66.     The number of cases such as Heyworth, in which AIS has mistakenly predicted that a crash victim was not "likely to die" and most evidence was lost before a posthumous AIS investigation was launched, is unknown.

67.     Other cases of lost evidence due to premature termination of an AIS investigation based on misapplication of "the likely to die" standard have occurred. On September 4, 2010, Stephanos Tsigrimanis ("Tsigrimanis") was struck by a motorist in Brooklyn while riding a bicycle, sustaining severe head trauma. NYPD Oversight Hearing Transcript, 203:17 – 204:6; 204:19 – 205:2 (Statement of Nicole Bergman).

68.     NYPD officers first responding to the scene made repeated radio transmissions that Tsigrimanis was "likely [to die]," and called for AIS involvement.

69.     In response, an NYPD Lieutenant conferred with an unidentified physician who purportedly told the Lieutenant that Tsigrimanis's injuries were "non-life threatening." On this basis, AIS terminated its involvement in the investigation.

70.     Tsigriminis died three days later. Id. at 205:3-23. AIS then resumed its investigation, but by that time, virtually all evidence of the crash was lost. Id. at 205:24 – 206:17. AIS concluded that Tsigrimanis was at fault for the crash, based on the statements of the driver that killed him.

**F.      The Harm Caused by NYPD's Failure to Investigate Serious Crashes.**

71.     Civil and criminal liability in crashes often turn on the results of police investigations conducted pursuant to Sections 603 and 603-a.

14

72.     Conviction of a traffic violation committed in the course of causing personal injury often constitutes negligence *per se*, simplifying proof of a plaintiff's claim for damages.

73.     To the extent NYPD fails to conduct an immediate, reasonably diligent investigation of a crash pursuant to Sections 603 and 603-a, traffic violations underlying a crash are unlikely to be charged or prosecuted, and the availability of negligence *per se* will be diminished, along with the value of civil claims arising from the crash.

74.     Stevens' civil claims on behalf of the Estate of Heyworth have been diminished in value in this manner.

75.     New York courts apply a so-called "rule of two" under which recklessness on the part of a motorist will not be inferred absent the commission of at least two acts of negligence each of which contribute to the crash.  See People v. Cabrera, 10 N.Y.3d 370, 377-78 (2008) (holding that evidence demonstrating a defendant was traveling at an excessive speed at the time of a crash, without evidence of a second and additional act of negligence, was insufficient as a matter of law to sustain a verdict of criminal negligence).

76.     As a result, prosecutors often do not expect or pursue criminal charges against drivers in cases lacking evidence of two or more acts of negligence.

77.     For example, in a well-known crash that led to extensive racial strife in Crown Heights section of Brooklyn in 1991, a driver who struck and killed seven year-old Gavin Cato was not indicted on criminal charges due to the "rule of two":

>               The [decision not to indict] had been widely predicted, as the law
>               covering car accidents makes criminal charges relatively rare. Two

> possible charges were submitted to the grand jury, criminally negligent homicide and third-degree assault. But [Kings County district Attorney] Hynes said, explaining the law on vehicular homicide, the so-called "rule of two" which requires two negligent acts to justify a criminal indictment was not met.

John Kifner, "Grand Jury Doesn't Indict Driver in Death of Boy In Crown Heights," New York Times (Sept. 6, 1991).[3]

78.     Unless police immediately investigate and determine the potential traffic violations causing a crash as required by Sections 603 and 603-a, evidence of the violations is lost, the "rule of two" will not be met, and criminal charges are not pursued.

79.     NYPD's policy of failing to investigate underlying traffic violations in all but 2% of the crashes resulting in serious physical injury precludes many crash victims or their survivors from raising an issue concerning the defendant's liability for punitive damages.

80.     Stevens' claims on behalf of the Estate of Heyworth have been precluded and/or diminished in value in this manner.

81.     The New York State Office of Victim Services provides compensation to the victims of crimes. Absent a criminal conviction, victims of traffic crashes are ineligible for compensation. Stevens has applied for compensation from the Office of Victim Services based on Heyworth's death, but anticipates that his application will be denied because criminal charges against Webb have been dropped.

---

[3] See also "Cy Vance for DA," "Cy's Plan for the Future: Vehicular and Pedestrian Safety" (New York County District Attorney Cy Vance's view that "[t]here is no reason why two traffic violations are necessary in order to support a conviction of criminally negligent homicide. I view the "Rule of Two" as the result of case law which should be modified to reflect the reality that one vehicular crime is fully capable of killing."), available at http://www.cyvanceforda.com/planforthefuture/vehicularcrime (accessed June 8, 2012).

**G.  NYPD's Underreporting of Serious Crimes.**

82.  NYPD's policy of failing to investigate the underlying traffic violations in serious traffic crashes that could lead to criminal charges is part of a larger NYPD program of underreporting serious crimes.

83.  Fostering a public perception that serious crime in New York is declining, NYPD fails to investigate and preserve evidence of criminality in crashes, categorizing them as "accidents" rather than as felonies such as vehicular assault, vehicular manslaughter or criminally negligent homicide.

84.  As the New York Times has reported, the "desire of supervisors to keep recorded crime levels low" is known to officers and "'play[s] a role in [officers'] decision making.'" Al Baker and Joseph Goldstein, "Police Tactic: Keeping Crime Reports Off the Books," New York Times (Dec. 30. 2011), available at http://www.nytimes.com/2011/12/31/nyregion/nypd-leaves-offenses-unrecorded-to-keep-crime-rates-down.html (accessed June 8, 2012) (quoting Det. Louis A. Molina, president of the National Latino Officers Association).

85.  According to NYPD commanders interviewed by the Times, "officers sometimes bend to pressure to eschew report-taking." Id. "The sergeants . . . are acting on wishes of higher-ups to keep crime statistics down, a desire that is usually communicated stealthily . . . . [A]s 2011 draws to a close with felony numbers running virtually even with last year's figures, any new felony is a significant event in a precinct and source of consternation to commanders." Id.

86.     In a series of reports, Graham Rayman of the Village Voice revealed audio

recordings from one Brooklyn precinct in which deliberately refusing to take reports of

crimes, or misreporting felonies as lesser crimes, was routine:

> The practice of downgrading crimes has been the NYPD's scandal-
> in-waiting for years. The NYPD claims that downgrading happens
> only rarely, but in the course of reporting this story, the *Voice* was
> told anecdotally of burglaries rejected if the victim didn't have
> receipts for the items stolen; of felony thefts turned into
> misdemeanor thefts by lowballing the value of the property; of
> robberies turned into assaults; of assaults turned into harassments.

See, e.g., Graham Rayman, "*The NYPD Tapes: Inside Bed-Stuy's 81st Precinct,*" The

Village Voice (May 4, 2010), available at http://www.villagevoice.com/2010-05-

04/news/the-nypd-tapes-inside-bed-stuy-s-81st-precinct/ (accessed June 8, 2012).

87.     In particular, Rayman documented with multiple audio tape recordings,

available to the public, an unwritten NYPD policy by which patrol officers were

forbidden to take robbery complaints from victims in the field. An audio recording of a

meeting held with officers responsible for auditing the precinct's crime reports included

the observation "that the pressure to artificially lower crime statistics is fueled by the

bosses downtown. 'The mayor's looking for it, the police commissioner's looking for it .

. . every commanding officer wants to show it. . . . So there's motivation not to classify

the reports for the seven major crimes.'" Id.

88.     In another precinct, a series of six strikingly similar robberies involving

attempted sexual assault, all of which occurred over a short period of time in Washington

Heights, were misreported by police as misdemeanors or other minor crimes without a

sexual component. As a result, no pattern to the crimes was discerned until a detective

18

investigating a report by the seventh victim fortuitously uncovered it. "[S]upervisors had made sure that the early reports were shaded to keep them from being filed as serious, felonious crimes." Rayman, *"NYPD Tapes 3: A Detective Comes Forward About Downgraded Sexual Assaults,"* Village Voice (Jun. 8, 2010) available at http://www.villagevoice.com/2010-06-08/news/nypd-tapes-3-detective-comes-forward-downgrading-rape/ (accessed June 8, 2012).

89.     A recent peer-reviewed study that surveyed more than 100 retired NYPD captains found that more than half of them were aware of crime reports that had been downgraded due to institutional pressure to under-report serious crime. Eterno, John, and Silverman, Eli, *"NYPD's Compstat: Compare Statistics or Compose Statistics?,"* 12 International Journal of Police Science and Management , No. 3 (Autumn 2010): 426 to 449.

90.     Eterno and Silverman write of "an unrelenting, often unethical pressure to manipulate crime statistics." Michael Powell, "No Room for Dissent in a Police Department Consumed by the Numbers, New York Times (May 7, 2012), available at http://www.nytimes.com/2012/05/08/nyregion/no-room-for-dissent-in-a-police-department-consumed-by-the-numbers.html (accessed June 8, 2012) (hereafter "Powell.")

91.     In January 2010, NYPD Commissioner Raymond Kelly announced the formation of a three-person commission to examine whether downgrading or underreporting of crime statistics was a citywide problem within the NYPD. At the time,

NYPD officials stated that the commission would issue a report within approximately six months.

92.     Thirty months later, the commission still has not issued any report.

93.     On May 7, 2012, the New York Times reported that problem of underreporting and downgrading of serious crime within the NYPD remained unresolved:

> There's no definitive proof that top officials systematically manipulate crime data and set arrest quotas. But officers have stepped forward in recent years to talk of such practices in widely scattered precincts: Adrian Schoolcraft in the 81st in Brooklyn, and Chris Bienz in Queens. All of them, along with Officer Polanco, spoke first to Graham Rayman of The Village Voice and Jim Hoffer of the local ABC affiliate. Two officers from Brooklyn detailed near-identical complaints for me recently, although they requested anonymity. The department has said repeatedly that it is examining the many accusations of manipulation of crime data . . .

Powell.

94.     NYPD's failure to investigate 98% of crashes causing serious physical injury reflects a systematic downgrading of serious crimes, creating an appearance that the numbers of vehicular assaults and vehicular homicides committed in New York City is lower than it actually is.  Crashes caused by criminal recklessness are classified by NYPD as "accidents" because the conduct of the parties involved is routinely not investigated and evidence of culpability is routinely permitted to be destroyed.

95.     NYPD's policy and custom of failing to investigate crashes and prematurely terminating crash investigations, and the resulting destruction of evidence, thwarts and demonstrates deliberate indifference toward the rights of crash victims and their survivors in obtaining criminal and civil justice.

## COUNT ONE – SURVIVAL CLAIM FOR NEGLIGENCE
## UNDER NEW YORK EPTL § 11-3.2(b)
## (AGAINST WEBB AND CUBIA-WEBB)

96.    Plaintiff realleges the allegations set forth in paragraphs 1-95 above as if

set forth separately in this count of the complaint.

97.    At the time of the Crash, Webb owed Heyworth various duties to use care

in the operation and control of the Automobile to avoid striking her.  Webb's failure to

discharge one or more of these duties proximately caused Heyworth's serious personal

injuries, expenses for medical care and treatment, funeral expenses, and damage to her

personal property, in amounts to be proven at trial.

98.    Pursuant to New York Motor Vehicle & Traffic Law Section 388, Cubia-

Webb is vicariously liable for the harm Webb caused to Heyworth.

## COUNT TWO– SURVIVAL CLAIM FOR GROSS NEGLIGENCE
## UNDER NEW YORK EPTL § 11-3.2(b)
## (AGAINST WEBB ONLY)

99.    Plaintiff realleges the allegations set forth in paragraphs 1-98 above as if

set forth separately in this count of the complaint.

100.    On information and belief, immediately prior to the Crash, Webb was

aware of the presence of Heyworth on the road, and was aware that his operation of the

Automobile was likely to cause Heyworth serious physical injury, but due to Webb's

impairment, excessive speed, and other acts of recklessness and willful or wanton

negligence undertaken in conscious disregard of Heyworth's legal rights, Webb was

unable to avoid causing the Crash.

101.    As a result of Webb's recklessness, Webb's willful or wanton negligence, and/or Webb's conscious disregard of Heyworth's legal rights, Heyworth sustained serious personal injuries, causing her loss of earnings, expenses for medical care and treatment, funeral expenses, and damage to her personal property, in amounts to be proven at trial.

## COUNT THREE – CLAIM FOR NEGLIGENT AND GROSSLY NEGLIGENT ENTRUSTMENT UNDER NEW YORK LAW (AGAINST CUBIA-WEBB ONLY)

102.    Plaintiff realleges the allegations set forth in paragraphs 1-101 above as if set forth separately in this count of the complaint.

103.    At the time of the Crash, Webb was not licensed to independently operate a motor vehicle in any jurisdiction, was impaired by the use of alcohol, and had a history of seven driver's license suspensions and two convictions for unlicensed driving.

104.    On information and belief, Cubia-Webb knew or had reason to know, when she entrusted the Automobile to him, that Webb had a history of and propensity toward unsafe and/or reckless driving, and/or was otherwise unfit or incompetent to drive.

105.    As a result of Cubia-Webb's negligence, recklessness, and/or willful or wanton conduct in entrusting the Automobile to Webb, Heyworth sustained serious personal injuries, causing Heyworth extensive pain and suffering, loss of earnings, expenses for medical care and treatment, funeral expenses, and damage to her personal property, in amounts to be proven at trial.

22

111. The City and its agents Roe, Bono and Doe breached NYPD's duty under VTL Section 603(1) by failing to immediately investigate the Crash and to take steps to avoid the destruction of critical evidence.

112. Due to the failure of the City and its agents Roe, Bono and Doe to immediately and reasonably investigate and gather evidence of Webb's culpability, the ability of Stevens to prove his civil claims against Webb, and therefore the value of those claims, has been materially impaired, causing Stevens losses in amounts to be proven at trial.

113. The dropping of all criminal charges against Webb as a result of the wrongful acts of the City and its agents Roe, Bono and Doe has disqualified Stevens from receiving compensation from the New York State Office of Victim Services, causing Stevens losses in amounts to be proven at trial.

### COUNT SIX – NEGLIGENCE UNDER NEW YORK VTL § 603-a (AGAINST THE CITY, ROE, BONO AND DOE)

114. Plaintiff realleges the allegations set forth in paragraphs 1-113 above as if set forth separately in this count of the complaint.

115. Under New York Vehicle and Traffic Law Section 603-a(1), NYPD had a duty to investigate the Crash, preserve evidence, and to determine, among other things, whether Webb had violated any law or rule in causing the crash.

116. Although Heyworth was not dead at the time NYPD suspended its investigation of the Crash scene, it was readily apparent that she had suffered serious physical harm due to the Crash, which is defined (through incorporation by reference of New York Penal Law Section 10.00(10)) as "physical injury which creates a substantial

24

risk of death, or which causes death or serious and protracted disfigurement, protracted impairment of health or protracted loss or impairment of the function of any bodily organ."

117.    The City and its agents Roe, Bono and Doe breached NYPD's duty under VTL Section 603-a(1) by (*a*) enacting a policy denying the requisite investigation except in cases where a crash victims was "dead or likely to die"; (*b*) cancelling AIS involvement in the investigation of the Crash within approximately one hour after the Crash occurred; (*c*) causing evidence of the nature and causes of the Crash and of Webb's impairment by alcohol, excessive speeding and other culpable conduct during the Crash to be destroyed; and (*d*) otherwise failing to conduct a reasonably diligent investigation of the Crash.

118.    Due to the failure of the City and its agents Roe, Bono and Doe to reasonably investigate and gather evidence of Webb's culpability, the ability of Stevens to prove his civil claims against Webb and therefore the value of those claims has been materially impaired, causing Stevens losses in amounts to be proven at trial.

119.    The dropping of all criminal charges against Webb as a result of the wrongful acts of the City and its agents Roe, Bono and Doe has disqualified Stevens from receiving compensation from the New York State Office of Victim Services, causing Stevens losses in amounts to be proven at trial.

## COUNT SEVEN – NEGLIGENT FAILURE TO SUPERVISE AND TRAIN
## UNDER NEW YORK STATE LAW
## (AGAINST ROE AND BONO)

120.    Plaintiff realleges the allegations set forth in paragraphs 1-119 above as if set forth separately in this count of the complaint.

121.    By virtue of his position within the NYPD, Roe has responsibility for NYPD policy concerning the response to, and investigation of, crashes causing serious physical injury and death.

122.    Roe also has general supervisory responsibility of AIS operations, including responsibility for ensuring that Bono and Doe are properly trained and supervised in the exercise of their discretion with respect to crashes causing serious physical injury and death.

123.    Obtaining a determination from a physician as to whether a crash victim under the physician's care has sustained serious physical injury, or is likely to die, requires specialized training and expertise.

124.    Roe and Bono are responsible for ensuring that Doe has been adequately trained to obtain such determinations.

125.    On information and belief, Roe and Bono were and are aware of numerous instances in which AIS personnel terminated AIS involvement in a crash investigation prematurely, resulting in the obstruction of a VTL 603-a investigation and the destruction of critical evidence.

126.    Roe and/or Bono's failure to train and supervise Bono and/or Doe and other AIS detectives to avoid the premature terminations of the Heyworth Crash

26

investigations and other crash investigations by AIS deprived Stevens of his property

interest in claims arising from Heyworth's death, in amounts to be determined at trial.

## COUNT EIGHT – INFLICTION OF EMOTIONAL DISTRESS
## (AGAINST ROE, BONO AND DOE)

127.    Plaintiff realleges the allegations set forth in paragraphs 1-126 above as if

set forth separately in this count of the complaint.

128.    The City and its agents' policy and practice of systematically failing to

conduct immediate and reasonably diligent investigations of crashes resulting in serious

physical injury, and in failing to conduct such an investigation of the Crash, constitutes

extreme and outrageous conduct.

129.    Bono and/or Doe's decision to terminate AIS involvement in the Crash

approximately one hour after it occurred, constitutes extreme and outrageous conduct.

130.    The defendants' termination of the Crash investigation, and the resulting

destruction of Crash evidence, demonstrates a disregard for the substantial probability

that doing so would cause severe emotional distress to Stevens.

131.    Roe's, Bono's and Doe's premature termination of the Crash

investigation, and resulting destruction of evidence and dropping of criminal charges

against Webb, has caused Stevens severe emotional distress and mental anguish, for

which he has required ongoing mental health treatment, incurring medical expenses, and

other damages and losses, in amounts to be determined at trial.

## COUNT NINE – RESPONDEAT SUPERIOR LIABILITY OF THE CITY
## (AGAINST THE CITY ONLY)

132.   Plaintiff realleges the allegations set forth in paragraphs 1-131 above as if set forth separately in this count of the complaint.

133.   The acts and omissions of Doe, Bono and Roe described above were committed in the course and within the scope of their employment by the City.

134.   As the employer of Doe, Bono and Roe, the City is vicariously liable for the damage and losses caused to Stevens in amounts to be determined at trial.

## COUNT TEN – DEPRIVATION OF PROCEDURAL DUE PROCESS UNDER
## FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION
## (AGAINST THE CITY, ROE, BONO AND DOE)

135.   Plaintiff realleges the allegations set forth in paragraphs 1-134 above as if set forth separately in this count of the complaint.

136.   Stevens' potential recovery based on the claims asserted in Counts One through Four of this complaint are property interests created under the laws of the State of New York.

137.   Stevens' potential receipt of compensation from the New York State Office of Victim Services is a property interest created under the laws of the State of New York.

138.   Stevens has a right to an immediate and reasonably diligent investigation of the Crash by NYPD pursuant to and meeting the requirements of VTL Section 603 and 603-a.

28

139.     Stevens' interests in preserving and marshaling evidence of Webb's culpability for the Crash, for use in pursuing a recovery from Webb and Cubia-Webb for compensatory and punitive damages, and in making a claim upon the New York State Office of Victim Services, are substantial.

140.     The City, Roe, Bono and Doe have materially impaired Stevens' interests in his claims arising from the death of Heyworth, by prematurely terminating the investigation of the Crash, and causing the destruction of evidence.

141.     Stevens received no pre-deprivation opportunity to challenge the obstruction and failures of the City, Roe Bono and Doe which eliminated and/or impaired his property interests.

142.     No adequate post-deprivation remedies exist for the loss of critical evidence caused by the obstruction and failures of the City, Roe, Bono and Doe.

143.     Acting under color of law, the City, Bono and Doe deprived Stevens of property without due process of law, in violation of the Fourteenth Amendment to the United States Constitution, causing Stevens damage reflected in the lessened value of his potential recovery on Counts One through Four of this complaint, and his disqualification for compensation from the New York State Office of Victim Services, in amounts to be determined at trial.

### COUNT ELEVEN – INFRINGEMENT OF RIGHT OF ACCESS TO THE COURTS UNDER ARTICLE IV OF, AND THE FIRST AND FOURTEENTH AMENDMENTS TO, THE UNITED STATES CONSITUTION (AGAINST THE CITY, ROE, BONO AND DOE)

144.     Plaintiff realleges the allegations set forth in paragraphs 1-143 above as if set forth separately in this count of the complaint.

29

145. NYPD's failure to take measurements and photographs of the Crash scene meant the certain destruction of critical evidence concerning Webb's culpability, including without limitation: evidence concerning the location and length of the Automobile's skid marks; the position of Heyworth and clothing knocked from her relative to those skid marks; the location of Heyworth relative to any curbs, traffic lanes, and crosswalks on Vanderbilt Avenue; and the placement of any blood or other forensic evidence on the automobile itself.

146. On information and belief, NYPD's failure to identify or interview witnesses at the Crash scene, resulted in the loss of information concerning the identities of potential eyewitnesses to the Crash.

147. On information and belief, NYPD's failure to canvass neighborhood establishments for videorecordings of the Crash within a reasonable time after the Crash, resulted in the destruction of videorecordings of the Crash.

148. On information and belief, NYPD's failure to obtain information from the Event Data Recorder of the automobile immediately after the Crash resulted in the destruction of information concerning the speed and braking of the automobile in connection with the Crash.

149. NYPD's failure to conduct a valid test of Webb's blood alcohol level immediately following the Crash resulted in the destruction of evidence of Webb's impairment due to use of alcohol at the time of the Crash.

150. Due to the destruction of evidence of Webb's culpability for the Crash, Stevens is materially impaired in his ability to pursue claims for Heyworth's wrongful

30

death; for punitive damages against Webb; and in opposing comparative negligence defenses anticipated to be asserted by Webb and Cubia-Webb.

151.    As the AIS detective initially assigned to respond to the Crash, Doe was responsible for commencing an immediate investigation of the Crash and gathering and preserving evidence. In the alternative, Bono was responsible for cancelling the AIS investigation of the Crash before it even began. Roe was responsible for the policy under which Bono and/or Doe had the discretion to prematurely terminate and/or cancel the AIS investigation of the Crash. Roe, Bono and/or Doe are jointly responsible for the NYPD's failure to timely and reasonably investigate the Crash.

152.    The acts and omissions of Roe, Bono and/or Doe in failing to investigate the Crash were committed pursuant to a policy of the City of failing to investigate crashes causing non-fatal serious physical injuries, and of underreporting vehicular crime.

153.    The acts and omissions of Doe, Bono, Roe and the City, under color of law, in terminating the investigation of the Crash and causing the destruction of evidence of Webb's culpability, demonstrate a deliberate indifference to the rights of Stevens in claims arising from the death of Heyworth.

154.    The impairment of Stevens' ability to pursue claims arising from the death of Heyworth constitutes a substantial infringement of his right of access to the courts under Article IV of the United States Constitution, and the First and Fourteenth Amendments to the Constitution, for which Doe, Bono, Roe and the City are liable, in amounts to be proven at trial.

31

## COUNT TWELVE – DEPRIVATION OF CONSTITUTIONAL RIGHTS BY POLICY, PRACTICE AND CUSTOM PURSUANT TO *MONELL* (AGAINST THE CITY ONLY)

155. Plaintiff realleges the allegations set forth in paragraphs 1-154 above as if set forth separately in this count of the complaint.

156. At all relevant times, the City, acting through its police department and its police commissioner, had in effect policies, practices, and customs as articulated above that were a direct and proximate cause of the unconstitutional conduct of defendants.

157. As a direct and proximate result of the City's wrongful policies, practices, customs and/or usages complained of above, Stevens suffered an injury to his property interests in claims arising from the death of Heyworth, and suffered mental injury, anguish, suffering, humiliation and embarrassment.

158. All of the acts and omissions of the defendants described above deprived Stevens of federally-protected rights, including but not limited to the rights:

    a.  of access to the courts;

    b.  not to be deprived of property without due process of law; and

    c.  not to be subjected to severe emotional distress.

159. As a result of defendants' acts under color of law, Stevens was injured and damaged in an amount to be determined at trial.

WHEREFORE, Plaintiff demands judgment against Defendants, for punitive and/or compensatory damages, jointly and severally, in an amount to be determined at trial, and against Defendants, jointly and severally, and for attorneys fees, costs and disbursements.

## COUNT TWELVE – DEPRIVATION OF CONSTITUTIONAL RIGHTS BY POLICY, PRACTICE AND CUSTOM PURSUANT TO *MONELL* (AGAINST THE CITY ONLY)

155.　Plaintiff realleges the allegations set forth in paragraphs 1-154 above as if set forth separately in this count of the complaint.

156.　At all relevant times, the City, acting through its police department and its police commissioner, had in effect policies, practices, and customs as articulated above that were a direct and proximate cause of the unconstitutional conduct of defendants.

157.　As a direct and proximate result of the City's wrongful policies, practices, customs and/or usages complained of above, Stevens suffered an injury to his property interests in claims arising from the death of Heyworth, and suffered mental injury, anguish, suffering, humiliation and embarrassment.

158.　All of the acts and omissions of the defendants described above deprived Stevens of federally-protected rights, including but not limited to the rights:

    a.　of access to the courts;

    b.　not to be deprived of property without due process of law; and

    c.　not to be subjected to severe emotional distress.

159.　As a result of defendants' acts under color of law, Stevens was injured and damaged in an amount to be determined at trial.

WHEREFORE, Plaintiff demands judgment against Defendants, for punitive and/or compensatory damages, jointly and severally, in an amount to be determined at trial, and against Defendants, jointly and severally, and for attorneys fees, costs and disbursements.

32

Dated:        New York, New York
              June 11, 2012

                                         Respectfully submitted,

                           By:           _____

                                         Steve Vaccaro, Esq.
                                         Of Counsel
                                         Law Office of Rankin & Taylor
                                         350 Broadway, Suite 701
                                         New York, NY 10013
                                         t: 212-226-4507

33